Ms. Duff is a woman in her mid-30s. She alleges disability due to disabling back pain. Ms. Duff was in two motor vehicle accidents, the first in her early 80s and the second in her mid-90s, and ultimately she quit work in 1999 due to her progressive back pain. Today I'd like to address what I believe is the main issue in this case, which is the ALJ's failure to recognize the diagnosis of psychological factors affecting the physical condition. He failed to recognize that diagnosis in his decision and therefore failed to appreciate how that diagnosed condition interacts with her back impairment to create disability. Complaints of pain that stem in part from a psychological abnormality should not be analyzed differently from complaints of pain that stem from a physical abnormality. Where an individual presents objective medical evidence of a psychological disorder that might reasonably be expected to result in pain, the commissioner should not disregard those complaints of pain. In this case, Ms. Duff established the presence of a condition, psychological factors affecting a physical condition, which could reasonably be expected to precipitate or aggravate her complaints of back pain. The ALJ did not discuss the evidence supporting this diagnosis. Instead, in his decision, he chose to focus slowly on how the physical findings alone did not support the degree of pain alleged. He gave no indication of what he made of the psychologist's diagnosis of psychological factors affecting a physical condition and completely missed his diagnosis of a somatoform disorder. He actually noted that the examining psychologist had not made such a diagnosis. Now, the examining doctor that I'm talking about is Nathaniel Nimes. He examined Ms. Duff five times during the course of the time from her alleged onset date of February 1999 through 2000. Each time that Dr. Nimes evaluated Ms. Duff, he diagnosed psychological factors affecting a physical condition, he diagnosed a depressive disorder secondary to chronic pain, and he diagnosed, he listed somatization disorder as a possible diagnosis. His final examination resulted in an actual diagnosis of a somatization disorder. So we think the main issue in this case is this diagnosis and the ALJ's failure to really even address the fact that this diagnosis occurred. Dr. Nimes' evaluations aren't the only indication in the record that there's something psychological playing a role in this case. On May 12, 1999, Ms. Duff went to see Dr. Siani, who noted that her symptoms were out of proportion to her physical findings, and he recommended a psychological evaluation due to chronic pain behavior. That's at the excerpts at page 39. Based on this recommendation by Dr. Siani, Ms. Duff actually first went to go see Dr. Nimes, and that's when he diagnosed the psychological factors affecting a physical condition, confirming Dr. Siani's belief that there was something more going on there. In addition to the evaluations of Dr. Nimes, Ms. Duff went to see another psychologist, Dr. Boltwood. Dr. Boltwood's examination is being used by the commissioner to refute the diagnosis of Dr. Nimes. Now, the administrative law judge really didn't engage in an analysis in his decision of which opinion he was giving more weight. Well, the district court said that they were in conflict, didn't they? Didn't it? I can't recall the district court's exact wording. However, I think that that is the general of their opinion. I don't think they are in conflict, though. Dr. Bolt, what the district, what the administrative law judge said was that Dr. Boltwood had ruled out a somatoform disorder. He discussed this opinion at, it's at the excerpts at page 170. The reason that Dr. Boltwood ruled out a somatoform disorder, though, is that he thought, his statement in his examination was that he thought physical, her physical impairments explained her pain. And interestingly, the ALJ himself noted that Dr. Boltwood was not qualified to make this assessment. So if Dr. Boltwood had known that her physical complaints did not adequately explain her pain, he might have arrived at a different diagnosis. The ALJ, discussing Dr. Boltwood's report, also noted that it appeared nothing in the MMPI he performed would implicate a somatoform disorder. Dr. Boltwood didn't do an MMPI. MMPI stands for Minnesota Multiphasic Personality Disorder. Or, sorry, personality inventory. Sorry about that. He did perform something called the MPI, which is the, I can't remember the M. It's a pain inventory. The results of his pain inventory actually seemed to support a determination that psychological factors were at work in her case. He noted the MPI showed she was not coping adequately with her chronic pain at ER 91. He also stated he found it unlikely that Ms. Dove's functional limitations would improve in the near future and that she would continue to have intermittent difficulties with depression, anxiety, and irritability related to her chronic pain and attendant functional limitations. Finally, he opined that her depressed and anxious mood was likely to interact with her pain, resulting in reduced pain tolerance, decreased activity level, increased emotional distress, and limitations in available coping resources. So Dr. Boltwood, in his statements and his evaluation, clearly thought that there was an interplay between psychology and physiology. What do you say about the ALJ's comments on her, she was able to work for quite a while after the accidents, and then later when she began to seek treatment, I don't know whether before or during the adversarial period of this claim. Right. She didn't seem much interested in alternative work opportunities. I'm not certain, I'm going to answer your question. I don't know how much the ALJ put on that. Well, the ALJ commented that Ms. Dove's ability to work during part of the period after the motor vehicle accident indicated that she was able to work with these conditions that she had. And he used that to reject her pain complaints, basically. I think that's a clear and convincing reason for rejecting her testimony regarding pain. She had a motor vehicle accident in the 80s, and she continued to work. She had a motor vehicle accident in the mid-90s, and she continued to work. She started to work as a roper, and she experienced an exacerbation of her pain on that job. This was her testimony. And this is the statement that she's made to the doctors. How old was she when she had the accident? Let's see. She's in her mid-30s now. So she would have been pretty young at the time of the first accident, in her early 20s, and then she would have been in her late 20s at the time of the second accident. So if you could just describe, this is a 36-year-old woman who is now unable to do any work that exists in the community. Right. And if you could just describe in a nutshell what is the matter with her, could you? She has ‑‑ she alleges disability due to back pain. She has pain that she says prevents her from leaving the house a few days a week. It prevents her from lifting more than 10 pounds. Her treating physician, Dr. Rosendahl, noted that she has to change positions frequently because of the pain buildup. When she's standing or sitting, she begins to have a buildup of this pain that she's experiencing, such that then she has to sit down or stand up or lie down in order to relieve the pain. He also said that he thought she would need a 20-minute rest period in every hour. This is his opinion at 96 to 99 of the excerpts. So she has, you know, she believes that back pain is her main. It's mainly the back pain. Okay, thank you. You have about 30 seconds left if you need to. I'd like to reserve the remaining time for Dr. Rosendahl. Thank you. Good morning, Your Honors. I'm David Burdett, representing the appellee, the Commissioner Joanne Barnhart. We have a little competition outside, so if you could keep your voice up. We're in a construction zone, and we didn't know that was going to be happening today. The case is definitely one of those that implicates a psychological reading, almost, by the ALJ of what's really going on. As Ms. Gilbrow indicated, there's multiple, there are multiple orthopedic specialists whose opinions suggest that, really, we can't see any objective reason physically for why this person should be as limited as she claims. Counsel, let me just tell you specifically where my concern lies in your case. The ALJ at one point says this person has offered no support for the supposition that she suffers from somatization disorder, which I'm probably mispronouncing, and that Dr. Nimes said this is not a likely diagnosis. Well, that's just not correct. The ALJ seems somehow to misplace or do something with the final diagnosis, and there's a similar issue with the way that he sort of selectively read from some of the other medical reports, and it just, I guess that's my concern with your position in this case, that that infected the rest of his analysis, to just say there's nothing in this record to support this, and yet there is a diagnosis, and either he needs to recognize it or he needs to get more information, it seems to me, if he feels there's a conflict in the diagnosis. So what's your response to my concern? Well, I agree, Your Honor, that that was not a correct statement, to say that there is no evidence supporting the somatization disorder, because obviously Dr. Nimes first said no somatization disorder, but then at the last one in March of 2001, he said, well, yes, she is a somatization disorder. And if I could write the ALJ's decision, I would have said Dr. Nimes goes back and forth on whether there's a somatization disorder, but of course that's not the decision that we have. And if there's a need for clarification, there's a procedure for doing that. If he feels that a key piece of evidence is conflicting, he's supposed to go get a clarification. Well, now, I'm not sure that I agree with that all the way, Your Honor. Every time that there's a key piece of evidence that's in – even if there's one doctor that has conflicting opinions, the ALJ in one of these cases doesn't have to go back and order a new opinion. If he thinks that there's enough evidence on the record to make a decision, I mean, just because there's a – there's a conflict within the multiple opinions of one doctor, that doesn't automatically implicate a duty to go back and order new opinions. He can do that. Well, okay. That's fair enough. But what do we do with the fact that the ALJ was just flatly wrong in saying that this had not been diagnosed? What do we do with that? Well, I think it's a harmless error, because I think that there's nothing that – there's nothing – there's nothing there in Dr. Knives' opinions that supports a shift from one position to another. That's basically our response. Don't we have to send it back for the ALJ to say that, though? In administrative law cases, we don't do the sort of harmless error review that we do in court cases, do we? Well, no, we do. We do. We don't – we perhaps don't use the exact same standard as you do when you're sitting in review on what a district court judge said. But there is harmless error in administrative law cases, and there is harmless error in Social Security administrative law cases. Like Batson, for example, last year, where an ALJ said that because a person was capable of spending hours watching television, that they were not credible as to their daily activities. Well, that was basically a bogus reason for coming to their conclusion. Right. We reviewed the reason that it was given. Yeah. But the ALJ supplied other reasons also. But I think the problem here is that we have to review the analysis that the ALJ did, don't we? And we can't say, well, looking at the evidence a different way, we would – it would be clear that this result has to be reached. I don't think we can really do that in administrative law cases, can we? But I still think that it's the burden of the claimant to come forward and prove why, if you have, for instance, a Step 4 case like this, where a person is claiming that they can no longer do their past relevant work, to prove why they can't. The problem is if the error is back at Step 2, if the impairments are much more significant, then wouldn't that necessarily, or not necessarily, wouldn't that potentially also affect the downstream analysis as well? Potentially it could. Potentially it could. Yes, that's right. And what I would hope, and, you know, the Court may or may not find this convincing, but I think that in this case, there's enough evidence to suggest that whether or not we consider a severe somatization disorder or whether we just go with the affective that this person is not showing that they have impairments that significantly limit their abilities to perform the work functions of their job. And I think that the evidence supports that. I think the fact that she claims to be disabled on the basis of accidents that happened when she was, well, first in her 20s and then 31, I believe, or 30, 29, actually, and then she continues to work until 1999, that is a troubling fact. I think that the fact that these doctors say there's nothing there, that's a very troubling fact. I agree with you. But under the law that the government itself has set out, the ALJ can't just look at the evidence and say looking at the totality of the evidence, I don't think that she's disabled because she's only 36 years old and she was working and up until such and such a time. I mean, you have to go through the analysis of whether or not there is an impairment, what job, et cetera. Well, yes, Your Honor, without a doubt. All right. I mean, basically, we've jumped to the heart of the case. The rest that I have is to make some remarks about her credibility. And I think that the ALJ's analysis turns on the credibility analysis. Now, if he's ---- It does, but doesn't his credibility analysis also relate to whether he thinks she's making things up that aren't supported by the medical evidence? I mean, that isn't his entire reason, certainly. But isn't there a relationship there that he thinks she's just exaggerating everything and trying to figure out there's no doctor to support her? Maybe he would have had a different view if he had acknowledged that. Well, yes and no. Yes, that's definitely related. No, I don't think this ALJ would have had a different view of this claimant. The fact that she went to her ---- as the ALJ indicated in his opinion, the fact that she went to her state Kitsap Community Health Centers and went to a state-mandated counselor and said to this person, well, in effect, I don't have a psychological impairment, but I need to say that I have one in order to stay on this benefits program. That's a pretty powerful analogy to the federally administered benefits program that we're dealing with here. It says, well, this is a person who is likely to be willing to exaggerate or to obtain benefits. Doesn't that also in turn, though, potentially turn on the possibility that people with psychological problems may deny or not recognize that they have them or would not be willing to say to someone else? No, no, no. That point doesn't turn on that because the relevant question about that sub-issue is not whether she actually has it and is in denial, but whether she has insight into the nature of her own problems or not, that she is willing to say to somebody else, I don't have ---- I want you to say that I have this problem even though I don't in my own belief. That's my position on that. And so these are the reasons, essentially, why we believe in the ALJ's decision and we think that it should have been defended. And we would request that the Court affirm it. Thank you. Thank you, Your Honor. I disagree with the Commissioner on the analysis of Ms. Duff's statement to Kitsap Mental Health Center. She was sent there for evaluation of her depression. When she arrived, she said, I'm not depressed. They told me to come here, but I'm not depressed. She lacks insight into how her psychological conditions impact her physical condition. Depression isn't really what we're talking about here. It's a somatoform disorder. All right. Thank you. Thank you. This argument is submitted for decision.
judges: Schroeder, Goodwin, Graber